# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558

---

| | |
|---|---|
| Appellate Court Caption | BLAINE LAMB-ROSENFELDT, Individually and as Special Administrator of the Estate of Lee Lamb, Decedent, Plaintiff-Appellant, v. BURKE MEDICAL GROUP, LTD., KATHRYN BURKE, D.O., and ST. JAMES HOSPITAL AND HEALTH CENTER, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-1558 |
| Rule 23 Order filed | February 2, 2012 |
| Rule 23 Order withdrawn | March 19, 2012 |
| Opinion filed | March 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendant hospital in an action seeking to hold the hospital vicariously liable for the alleged negligent treatment provided by the primary care physician of plaintiff's decedent, since plaintiff failed to present a sufficient factual basis to satisfy the elements of "holding out" and reliance necessary to subject the hospital to vicarious liability. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-9866; the Hon. Drella C. Savage, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Otubusin & Associates, P.C., of Chicago (M. Anne Hannigan, of counsel), for appellant. |
|---|---|
| | Cassiday Schade LLP, of Chicago (Bradford D. Roth, Jeffrey A. Hesser, and Julie A. Teuscher, of counsel), for appellee St. James Hospital and Health Center. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Fitzgerald Smith concurred in the judgment and opinion |

**OPINION**

¶ 1      Plaintiff Blaine Lamb-Rosenfeldt, daughter of decedent Lee Lamb and special administrator of Lamb's estate, appeals an order of the circuit court awarding summary judgment in favor of defendant St. James Hospital and Health Center (St. James) on plaintiff's medical malpractice and wrongful death action. On appeal, plaintiff maintains that the circuit court's order was entered in error because genuine issues of material fact exist as to whether St. James can be held vicariously liable for the alleged negligent acts of Lamb's treating physician. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 2                                    BACKGROUND

¶ 3      Decedent Lee Lamb was a patient of Doctor Kathryn Burke from November 2004 to January 2006. In 1996, prior to becoming Doctor Burke's patient, Lamb was diagnosed with, and treated for, lung cancer. During the time that Doctor Burke was Lamb's primary care physician, she was aware of Lamb's prior history of lung cancer. Lamb obtained medical care from Doctor Burke at two locations: Burke Medical Group, Ltd. (Burke Medical), and St. James.

¶ 4      Prior to obtaining treatment at St. James, Lamb was required to sign a one-page "Consent For Medical Treatment Form." The one-page document contained four sections including a consent for diagnosis and treatment, an authorization for release of information, a waiver of liability regarding personal valuables and an independent contractor physician disclosure statement. In pertinent part, the disclosure statement provided:

"**STATEMENT OF UNDERSTANDING: PHYSICIANS ARE NOT EMPLOYEES OF THE MEDICAL CENTER**: I understand that St. James Hospital utilizes independent physicians and consultants to perform services for patients at its hospitals. These physicians may include my private physician, a physician from a physician group

-2-

who has agreed to treat me because I do not have a physician on staff or a consultant. With the exception of some anesthesiologists who might provide anesthesia to some patient in the hospital, NONE OF THE PHYSICIANS WHO ATTEND TO ME AT THE HOSPITAL ARE AGENTS OR EMPLOYEES OF THE HOSPITAL and therefore, they, and not the hospitals, are legally liable for the physicians' acts. I further understand that one (1) or more of these physicians might be involved in my care, for example, through reading of x-rays, interpreting laboratory tests, providing emergency medical care or performing surgery. In most cases, I can expect to receive a separate bill from my private physician, a member(s) of the physician group or consultant who has treated me. However, in some cases, third party payers, such as an insurance company, may require certain independent physician charges to be included as part of the total hospital billings. In these cases the hospital may be required to bill me for physician services although the physician IS NOT AN EMPLOYEE OR AGENT OF THE HOSPITAL."

¶ 5 At the bottom of the page, after the disclosure statement and before the signature line was the following statement: "I CERTIFY THAT I HAVE READ AND UNDERSTAND THIS CONSENT AND THAT NO GUARANTEE OR ASSURANCE HAS BEEN MADE AS TO THE RESULTS OR OTHER ASPECT OF ANY TREATMENT, PROCEDURE, OR TEST AUTHORIZED HEREUNDER."

¶ 6 Decedent signed the hospital's consent for medical treatment form containing the aforementioned disclaimer on seven occasions: January 20, 2005; January 24, 2005; June 10, 2005; August 23, 2005; November 21, 2005; January 10, 2006; and January 14, 2006. Lamb also signed another form, entitled "Authorization for Payment/Release of Responsibility," on two occasions: January 20, 2005, and January 14, 2006. This form contained the same physician disclosure statement that was contained in the aforementioned consent for medical treatment form.

¶ 7 In February 2006, Lamb was once again diagnosed with lung cancer. Starting on March 29, 2006, Lamb commenced treatment with an oncologist and continued treatment with him until September 2006. Lamb ultimately died on October 23, 2006, as a result of complications from her second bout of lung cancer.

¶ 8 On September 5, 2008, plaintiff, as special administrator of her mother's estate, filed a multiple-count complaint naming Doctor Burke, Burke Medical, and St. James as defendants. The crux of plaintiff's malpractice claim was the allegation that Doctor Burke was negligent in failing to diagnose a recurrence of decedent's lung cancer between November 2004 and January 2006, which impaired Lamb's chance for survival and shortened her life. Specifically, the complaint alleged that Doctor Burke failed to properly screen Lamb for the recurrence of her cancer after Lamb developed symptoms indicative of recurrent lung cancer, including weight loss, fatigue, frequent coughs, difficulty swallowing and aspiration of food. The complaint further alleged that Doctor Burke was an employee or agent of both Burke Medical and St. James when she provided care and treatment to Lamb and that Doctor Burke was acting within the scope of her employment and/or agency when she rendered negligent medical treatment to decedent. In accordance with the pleading requirements for medical malpractice cases set forth in section 2-622 of the Illinois Code of Civil Procedure (735 ILCS 5/2-622 (West 2008)) plaintiff attached a "Certificate of Merit

-3-

in Medical Malpractice" completed by Doctor Erin Egan to her complaint.

¶ 9        Plaintiff subsequently filed an amended complaint on November 21, 2008. The amended complaint advanced the same allegations of medical negligence against Doctor Burke as well as the same purported employee and/or agent relationship between Doctor Burke and codefendants Burke Medical and St. James. The amended complaint contained a new "Certificate of Merit in Medical Malpractice" completed by Doctor Egan that set forth a more comprehensive and detailed critique of the care that Doctor Burke provided to Lamb.

¶ 10       The parties proceeded with discovery. Both Doctor Burke and St. James filed answers to interrogatories submitted by plaintiff. In pertinent part, in response to plaintiff's question regarding Doctor Burke's employment relationship with St. James, both parties denied that she was ever an employee of the hospital. Instead, Doctor Burke indicated that she was incorporated as a professional corporation and was an employee and agent of Burke Medical at the time that she provided treatment to Lamb. Although she was never an employee of St. James, Doctor Burke detailed her affiliation with St. James over the years in the curriculum vitae that she attached to her answer to plaintiff's interrogatories. In pertinent part, Doctor Burke indicated that she was an attending physician at St. James since 1988, chief of staff of St. James from 1996-2001 and vice president of the medical staff of St. James from 2003-07.

¶ 11       Doctor Burke and plaintiff were subsequently deposed. In her discovery deposition, Doctor Burke indicated that she first met decedent at Doyle's Designs, the hair salon where decedent worked. The owner of the salon was one of Doctor Burke's patients and Lamb subsequently learned that Doctor Burke was a physician. On several occasions when Doctor Burke came to the salon to get her hair done, decedent would ask Doctor Burke medical questions pertaining to her health and inquire about her lab results. Decedent indicated that she no longer wished to continue treatment with her current physician. In November 2004, in response to decedent's questioning, Doctor Burke suggested that decedent schedule a formal appointment at her office at Burke Medical Group. Doctor Burke saw Lamb for the first time at her office on November 9, 2004. Following her initial visit, Lamb came to appointments at Doctor Burke's office on November 15, 2004, November 22, 2004, and January 3, 2005. Doctor Burke explained that she saw Lamb at her office at Burke Medical on a number of occasions before she ever saw Lamb at St. James.

¶ 12       Doctor Burke indicated that she was never an employee of St. James when she provided treatment to Lamb; rather, she was self-employed. Doctor Burke further denied she or any member of her staff would have ever told Lamb or plaintiff that she was an employee of St. James. Although she had served as chief of staff of St. James,[1] Doctor Burke indicated that she never received payment from the hospital; rather, she received a check from the St.

_____

[1]In her deposition, Doctor Burke indicated that she served as chief of staff of St. James "periodically" from 1996 to 2007. However, in the curriculum vitae attached to her response to plaintiff's interrogatories, Doctor Burke indicated that she held that title from 1996-2001. Despite this discrepancy, it appears that both parties agree that Doctor Burke was chief of staff of St. James during the time that she was decedent's treating physician.

James medical staff fund, which is a separate and distinct entity from the hospital. Doctor Burke's position as chief of staff was merely an administrative role, and she explained that she did not see patients in that capacity. She did not recall informing Lamb or plaintiff that she was chief of staff of St. James.

¶ 13    In her deposition, plaintiff confirmed that her mother first met Doctor Burke at Doyle's Designs. Before she became Doctor Burke's patient, Lamb would talk to Doctor Burke about her health and various medical procedures and Doctor Burke would occasionally provide Lamb with prescription medication. Plaintiff explained that her mother became unhappy with the care that her current doctor was providing and decided to stop seeing her. Approximately three months later, in November 2004, Lamb had her first appointment with Doctor Burke. Sometime during Doctor Burke's treatment of Lamb over the years, Lamb began having some health problems. Plaintiff indicated that Lamb developed a chronic cough, spit up blood and food, and complained of fatigue. Plaintiff indicated that her mother saw Doctor Burke at Burke Medical on a number of occasions before she was ever admitted to St. James. Plaintiff confirmed that Doctor Burke recommended that her mother go to St. James to receive further treatment from her. Plaintiff believed her mother would have gone to any facility that Doctor Burke told her to go to unless the distance was too great and was too problematic to get to.

¶ 14    With respect to Doctor Burke's affiliation with St. James, plaintiff indicated that she conducted an Internet search on Doctor Burke and learned that she was the chief of staff of St. James. Plaintiff also called Doctor Burke's office and spoke to a receptionist who informed her that Doctor Burke was "employed through the hospital." Plaintiff did not recall whether this conversation took place before or after her mother's death. Plaintiff also confirmed that her mother's signature appeared on multiple consent for medical treatment forms that contained a physician disclosure statement indicating that the doctors at St. James were not employees of the hospital; however, plaintiff indicated that she was not present when her mother signed the forms and did not know whether decedent asked questions prior to signing the forms.

¶ 15    St. James subsequently filed a motion for summary judgment. In its motion, St. James observed that plaintiff's action against the hospital was premised entirely on allegations of agency between Doctor Burke and the hospital and that plaintiff had not advanced any independent allegation of negligence against St. James. St James then argued that there was no genuine issue of material fact that Doctor Burke was never an employee or actual agent of St. James when she provided medical care to decedent. St. James observed that Doctor Burke had testified in her discovery deposition that she was self-employed and merely served as the chief of staff of St. James. That position was administrative in nature and Doctor Burke did not provide patient care as the chief of staff. Moreover, St. James argued that there was no evidence to support an allegation of apparent agency given that: (1) "plaintiff's decedent had a pre-existing physician[-]patient relationship with Doctor Burke and knew or reasonably should have known at the time of the treatment in question that Doctor Burke was not an employee or agent of St. James Hospital"; and (2) "plaintiff's decedent signed multiple consent forms prior to and during her treatment at St. James Hospital which clearly indicated that the physicians that were treating her were not employees or agents of the

-5-

hospital." Accordingly, because there was no genuine issue of material fact that Doctor Burke was not an actual or apparent agent of St. James, the hospital argued that it could not be subject to vicarious liability for the alleged negligent treatment that Doctor Burke purportedly provided to decedent and that St. James was entitled to summary judgment as a matter of law.

¶ 16    Following St. James's motion, plaintiff sought, and obtained, leave to file a second amended complaint. In the filing, plaintiff reiterated the same allegation of negligence against Doctor Burke for failure to timely diagnose the recurrence of Lamb's lung cancer as well as the same allegation of actual or apparent agency between Doctor Burke and St. James. Plaintiff also apparently filed a response to St. James's motion for summary judgment; however, no copy of the response is contained in the record on appeal.

¶ 17    On May 3, 2010, the trial court heard oral argument on St. James's motion for summary judgment, the transcripts of which are also absent from the record, and subsequently filed an order granting the hospital's motion and dismissing all of the counts in plaintiff's complaint that alleged that actual or apparent agency existed between Doctor Burke and St. James. Thereafter, on May 10, 2010, the court modified its prior order. In the modified order, the court provided a rationale for its ruling, explaining: "Plaintiff failed to show reliance and there was no showing or evidence that the decedent knew or relied on information alleging Doctor Burke's position or alleged standing with St. James Hospital at the time of decedents [*sic*], treatment, tests or the execution of her consent forms." The modified order also included language pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), specifying that the court's ruling was "a final order as to St. James Hospital." Plaintiff's appeal followed.[2]

¶ 18                                    ANALYSIS

¶ 19    On appeal, plaintiff argues that the trial court erred in granting St. James's motion for summary judgment because there are genuine issues of material fact as to Doctor Burke's employment status with St. James and whether the hospital can be held vicariously liable for Doctor Burke's negligent treatment of Lamb. Specifically, plaintiff argues that Doctor Burke "was inextricably linked and connected with St. James Hospital" and held herself out as the chief of staff and an instructor at St. James. She contends that any reasonable person who was told that Doctor Burke held those positions would naturally and reasonably conclude that Doctor Burke was employed by the hospital. Plaintiff acknowledges that decedent Lamb signed multiple consent for medical treatment forms that clearly stated that none of the physicians who would provide treatment were agents or employees of the hospital; however, plaintiff argues that the St. James form is ambiguous and confusing as it contained several other provisions that were unrelated to the disclaimer and thus, the form was not enough to provide notice to Lamb about Doctor Burke's employment status with St. James. Given Doctor Burke's representations and the misleading nature of St. James's consent forms,

---

[2]The trial court's modified order constituted a final order as to St. James only. Plaintiff's suit against Doctor Burke and Burke Medical Group remains pending.

plaintiff contends that there is a genuine issue of material fact as to whether Doctor Burke was an apparent agent of St. James.

¶ 20    St. James responds that the trial court's ruling on its motion for summary judgment was correct as there is no genuine issue of material fact that Doctor Burke was not an apparent agent of the hospital. Although Doctor Burke had held the title of chief of staff of the hospital, St. James argues that Lamb knew, or should have known, that despite her title, Doctor Burke was not an employee or an apparent agent of the hospital. St. James emphasizes that Lamb signed a consent form each time she was admitted to the hospital that clearly stated in bold print that the physicians she received treatment from were independent contractors, not employees of the hospital. Contrary to plaintiff's characterization of its consent form, St. James maintains that the disclaimer language was clear and unambiguous and put Lamb on notice that Doctor Burke was not an employee of the hospital. In addition, given decedent's preexisting relationship with Doctor Burke, St. James maintains that it is clear that Lamb never relied upon St. James to provide medical care; rather, the hospital was merely the place from which Lamb received the medical care that she sought from Doctor Burke. Accordingly, because Lamb relied on Doctor Burke rather than the hospital to receive medical treatment, St. James argues that it cannot be held vicariously liable for medical services provided by Doctor Burke.

¶ 21    As a preliminary matter, before turning to the substance of plaintiff's appeal, we will address St. James's objection to the statement of facts contained in plaintiff's brief. We agree with St. James that plaintiff's statement of facts fails to accord with the requirements set forth in Illinois Supreme Court Rule 341(h)(6) (eff. July 1, 2008). Specifically, the fact section does not provide accurate citations to the record on appeal and contains impermissible argument. However, we note that it is within our discretion to consider an appellate brief notwithstanding an appellant's failure to comply with Rule 341(h)(6). *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 228 (2008). Given that we do not find that plaintiff's violations are so egregious that they hinder our review of the issues raised on appeal, we do not find it necessary to strike plaintiff's statement of facts; rather, we will simply disregard any improper or unsupported statements. *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009).

¶ 22    As another threshold manner, we observe that the record on appeal is incomplete. Specifically, full transcripts of Doctor Burke's and plaintiff's discovery depositions do not appear in the record; rather, only the excerpts that were attached to St. James's motion for summary judgment are present. Morever, plaintiff's response to St. James's motion for summary judgment and the transcript of the hearing that the trial court conducted on the motion are also missing from the record. Finally, although plaintiff cites to a supplemental record in her statement of facts, no such supplement to the record was ever filed with this court. We note that it is the burden of the appealing party to provide a reviewing court with a sufficiently complete record to allow for meaningful appellate review. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *Lewandowski v. Jelenski*, 401 Ill. App. 3d 893, 902 (2010). As a general rule, "[a]n issue relating to a circuit court's factual findings and basis for its legal conclusions obviously cannot be reviewed absent a report or record of the proceeding." *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005). In the absence of a sufficiently

complete record, a reviewing court will resolve all insufficiencies apparent therein against the appellant and will presume that the trial court's ruling had a sufficient legal and factual basis. *Foutch*, 99 Ill. 2d at 391-92; *Lewandowski*, 401 Ill. App. 3d at 902. We will keep these principles in mind as we address the merit of plaintiff's appeal.

¶ 23 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006). In reviewing a motion for summary judgment, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party to determine whether a genuine issue of material fact exists. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A plaintiff need not prove her entire case at the summary judgment stage; however, she must at least present a factual basis that could arguably entitle her to a judgment in her favor. *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1086 (2009). Although summary judgment has been deemed a "drastic means of disposing of litigation" (*Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)), it is nonetheless an appropriate mechanism to employ to expeditiously dispose of a lawsuit when the moving party's right to a judgment in its favor is clear and free from doubt (*Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001)). A trial court's ruling on a motion for summary judgment is subject to *de novo* review. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009).

¶ 24 Prior to 1993, hospitals in Illinois could be subject to vicarious liability for a physician's negligent acts only if the physician was an actual agent of the hospital. *Schroeder v. Northwest Community Hospital*, 371 Ill. App. 3d 584, 590 (2006) (citing *Johnson v. Sumner*, 160 Ill. App. 3d 173, 175 (1987), and *Greene v. Rogers*, 147 Ill. App. 3d 1009, 1015-16 (1986)). However, in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993), our supreme court held that under certain circumstances, a hospital may be subject to liability for negligent medical treatment provided by its actual agents *or* its apparent agents, that is, physicians who are actually independent contractors, not employees of the hospital. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006).[3] In *Gilbert*, the supreme court explained that pursuant to the doctrine of apparent authority, "[a] principal will be bound not only by that authority which he actually gives to another, but also by the authority which he appears to give. Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the

_____

[3]We note that plaintiff's argument on appeal centers solely around her allegation of apparent agency. She does not argue that Doctor Burke was an actual agent of St. James. See Ill. S. Ct. R. 341(h)(7) (points not argued on appeal are waived). Indeed, the record is clear that Doctor Burke was never employed or paid by defendant; rather, she was merely a hospital administrator and had privileges to work at St. James. Accordingly, even though St. James reasserts a lack of actual agency in its brief, given plaintiff's waiver of this issue and the lack of evidence in the record to support this claim, there is no need to address this issue substantively. See *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1085 n.1 (2009).

agent to possess." *Gilbert*, 156 Ill. 2d at 523.

¶ 25    For a hospital to be liable under the doctrine of apparent authority, a plaintiff must establish the following elements and show that: " '(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert*, 156 Ill. 2d at 525 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 856 (Wis. 1988)). To survive a defendant hospital's motion for summary judgment on a claim of apparent agency, a plaintiff must present at least some evidence to satisfy each of the *Gilbert* factors. *Wallace*, 389 Ill. App. 3d at 1086.

¶ 26    The first two *Gilbert* elements are frequently grouped together and have been referred to as the "holding out" factor. *Wallace*, 389 Ill. App. 3d at 1087. The focus of this factor is whether or not "the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524; see also *Wallace*, 389 Ill. App. 3d at 1087 (recognizing that there is no holding out where the patient "was placed on notice of the independent contractor status of" the doctor).

¶ 27    Although not dispositive of the "holding out" factor, whether a patient signs a hospital consent to treatment form that contains clear and unambiguous independent contractor disclaimer language is an important factor to consider with respect to this factor because it is unlikely that a patient who signs such a form can reasonably believe that her treating physician is an employee or agent of a hospital when the form contains specific language to the contrary. See, *e.g.*, *Wallace* 389 Ill. App. 3d at 1083, 1088 (finding that the plaintiff could not satisfy the apparent authority elements to subject the hospital to vicarious liability for the alleged negligent acts of two physicians where she signed a consent form that stated that the physicians providing treatment " 'are not the employees or agents of Alexian Brothers Medical Center, but they are independent contractors' " and that the hospital was " 'not responsible for the services these physicians provide' "); *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 632 (1998) (finding that there was no genuine issue of material fact that the hospital could not be held vicariously liable for the negligent acts of an obstetrician where the patient signed a consent to treatment form stating: " 'the physicians on staff at this hospital are not employees or agents of the hospital, but independent medical practitioners who have been permitted to use its facilities for the care and treatment of their patients' ").

¶ 28    Here, it is undisputed that decedent signed a four-paragraph consent form on seven occasions that contained language in bold print and capital letters stating that: "PHYSICIANS ARE NOT EMPLOYEES OF THE MEDICAL CENTER" and "NONE OF THE PHYSICIANS WHO ATTEND ME AT THE HOSPITAL ARE AGENTS OR EMPLOYEES OF THE HOSPITAL." In addition, on two occasions, Lamb also signed a payment authorization and release of responsibility form that contained identical disclaimer language. Altogether, decedent signed nine forms that contained clear disclaimer language.

¶ 29 Plaintiff, however, observes that the consent form contains three other sections unrelated to the physician disclaimer language and argues these other sections rendered the form ambiguous, confusing and insufficient to place decedent on notice as to Doctor Burke's independent contractor status. In support, plaintiff principally relies on our previous decision in *Schroeder v. Northwest Community Hospital*, 371 Ill. App. 3d 584 (2006), where we found that a genuine issue of material fact existed as to whether the hospital could be subject to vicarious liability based on confusing disclosure language found in the hospital's consent form. *Schroeder*, 371 Ill. App. 3d at 594-95. The consent form in that case contained six sections, including a disclosure statement, which was the second section on the form. *Id*. at 587. The statement, in pertinent part, provided: " 'Your care will be managed by your personal physician or other physicians who are not employed by Northwest Community Hospital or Northwest Community Day Surgery Center but have privileges to care for patients at this facility. Your physician's care is supported by a variety of individuals employed by Northwest Community Hospital or Northwest Community Day Surgery Center, including nurses, technicians and ancillary staff.' " (Emphasis omitted.) *Id*.

¶ 30 Although plaintiff correctly observes that the form in *Schroeder* and the form at issue here are similar in that they contain multiple parts, we find the forms distinguishable in several important respects. Indeed, while St. James's consent form contains three other sections unrelated to the physician disclaimer, the disclaimer section is the largest and is located directly above the signature line, whereas, the disclaimer language in *Schroeder* did not immediately precede the signature line, but was buried in the middle of the page. See *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 837 (2009) (finding the placement of the disclosure statement on the hospital's consent form to be relevant). Moreover, the form in *Schroeder* did not contain key phrases like "independent contractor" or "independent physician"; rather, it contained generic language that attempted to differentiate between those who were "employed by" and those who were "not employed by" the hospital, which could lead the trier of fact to conclude that the plaintiff might have been confused about which persons attending to his care were and were not employees of the hospital. Here, in contrast, the language is much clearer and uses the term "independent physicians" and states that "none of the physicians who attend to me at the hospital are agents or employees of the hospital." Unlike the disclosure in *Schroeder*, St. James's form does not attempt to differentiate between physicians and ancillary staff. Moreover, the form at issue here even makes it clear that the hospital's billing practices are separate and distinct from those of any physicians and advises patients that they can expect to receive separate bills from physicians. See *Wallace*, 389 Ill. App. 3d at 1092 (finding the disclosure language sufficiently different from that in *Schroeder* because it contained specific "independent contractor" language and clearly stated that the hospital's billing practices were separate and distinct from those of the physicians). Accordingly, we disagree with plaintiff that St. James's disclosure language and consent form were confusing and misleading; rather, we find the language contained therein to be clear and unambiguous and similar to that contained in the forms at issue in *Wallace* and *James*. After signing *nine* forms containing the aforementioned clear disclosure statement in bold, capitalized print, we find that decedent knew or should have known that Doctor Burke was an independent contractor at the time she

-10-

sought treatment from her at St. James.

¶ 31    Despite the clarity of the disclosure statement, plaintiff relies heavily on Doctor Burke's designation as "Chief of Staff" of St. James in an effort to satisfy the "holding out" requirement. We, however, do not find that Doctor Burke's administrative title is sufficient to override the clear unequivocal language in the disclosure statement and create a genuine issue of material fact of apparent agency. Initially, we note that there is no evidence that Lamb was ever informed that Doctor Burke was the chief of staff. Doctor Burke did not recall ever having such a conversation and plaintiff presents no evidence that any occurred. Moreover, the record is clear that Lamb saw Doctor Burke at her private office at Burke Medical on multiple occasions before ever seeing her at St. James. Although plaintiff's full discovery deposition is absent from the record, based on the excerpts of the depositions that we do have, it appears that plaintiff learned that Doctor Burke was the chief of staff after conducting an Internet search and after speaking to a receptionist at Doctor Burke's office. It is unclear however, when plaintiff learned this information, as she conceded she did not recall whether the Internet search and conversation took place before or after her mother's death. More importantly, there is no evidence this information was ever conveyed to Lamb or that she was ever aware of Doctor Burke's affiliation with the hospital. Indeed, there is no evidence that Lamb ever knew that Doctor Burke held the administrative role of chief of staff, let alone at the time she was first admitted to St. James. Although a plaintiff need not prove her entire case at the summary judgment stage, she must at least present a factual basis that could arguably entitle her to judgment. *Wallace*, 389 Ill. App. 3d at 1086. Here, we find that plaintiff failed to present a sufficient factual basis to satisfy the "holding out" requirement set forth in *Gilbert*, and thus, the trial court correctly entered summary judgment in favor of St. James on plaintiff's vicarious liability claim.

¶ 32    Assuming *arguendo* that the plaintiff could have presented a sufficient factual basis to satisfy the "holding out" requirement, we find that summary judgment was nonetheless proper because plaintiff failed to present any evidence to satisfy the reliance factor. With respect to the element of justifiable reliance, the focus is on whether the patient relied on the hospital to provide medical services or merely sought out a specific physician who had privileges at the hospital to receive her medical care. *York*, 222 Ill. 2d at 185. Specifically, the *Gilbert* court explained:

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care–from blood testing to radiological readings to the endless medical support services–will be provided by the hospital through its staff.' " *Gilbert*, 156 Ill. 2d at 525-26 (quoting *Pamperin*, 423 N.W.2d at 857).

¶ 33    Here, plaintiff's undisputed testimony was that Lamb went to St. James to receive treatment at the direction of Doctor Burke following initial appointments with Doctor Burke

-11-

at Burke Medical. Indeed, unless the distance was too far, plaintiff indicated that she believed her mother would have gone to any facility that Doctor Burke advised her to go to in order to receive medical treatment from her. Plaintiff's testimony undisputably establishes that her mother was relying on Doctor Burke, not St. James, to provide her medical care. St. James was merely the location from which Lamb received continued services from Doctor Burke. See *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508, 514 (2000) (finding no evidence of reliance where the patient merely went to the defendant hospital "because that is where his doctor had staff privileges and told him to go").

¶ 34    Plaintiff correctly observes that the mere existence of a preexisting physician-patient relationship does not automatically preclude any claim by a patient of reliance on a hospital. See *York*, 222 Ill. 2d at 193; *Spiegelman*, 392 Ill. App. 3d at 840-41. Indeed, in *York*, our supreme court clarified its ruling in *Gilbert*, stating:

"*Gilbert* did not hold that, regardless of the circumstances, the mere existence of a preexisting physician-patient relationship automatically precludes any claim by the patient of reliance upon the hospital for the *support staff*. Rather, *Gilbert* recognized that when a patient relies on a hospital for the provision of support services, even when a physician specifically selected for the performance of a procedure directs the patient to that particular hospital, there may be sufficient reliance under the theory of apparent agency for liability to attach to the hospital in the event *one of the supporting physicians* commits malpractice." (Emphases added.) *York*, 222 Ill. 2d at 193.

¶ 35    Here, based on the sparse nature of the record, it is unclear what precise services decedent received while at St. James, and we reiterate that all deficiencies in the record must be resolved against plaintiff. *Foutch*, 99 Ill. 2d at 391-92. It is clear, however, that plaintiff does not challenge the services of any supporting physicians that may have treated decedent; rather, plaintiff seeks to hold St. James vicariously liable solely on the basis of the purportedly negligent treatment provided by Doctor Burke. Based on the record, decedent relied on her primary care physician, Doctor Burke, with whom she had a preexisting physician-patient relationship, to receive medical care and did not rely on St. James to provide that treatment.

¶ 36    Ultimately, we find that plaintiff has not presented a sufficient factual basis to satisfy the elements of "holding out" and reliance necessary to subject St. James to vicarious liability. Accordingly, the circuit court was correct in finding that St. James was entitled to summary judgment as a matter of law.

¶ 37                                    CONCLUSION

¶ 38    For the reasons contained herein, we affirm the judgment of the circuit court.

¶ 39    Affirmed.